**AFFIRM in Part, REVERSE in Part, and RENDER; Opinion Filed June 21, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00381-CV

**BRANCH BANKING & TRUST COMPANY, Appellant & Cross-Appellee**
**V.**
**SCOTT SEIDEMAN, Appellee & Cross-Appellant, AND**
**L&S INVESTMENT PARTNERS, LLC, Appellee**

**ROBERT LEMELIN, LEO LEMELIN, AND BRIAN LEMELIN, Appellants**
**V.**
**BRANCH BANKING & TRUST COMPANY, Appellee**

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-12543**

## MEMORANDUM OPINION

Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Fillmore

L&S Investment, LLC (L&S) borrowed over eight million dollars from Colonial Bank, N.A. to finance the purchase of 6.72 acres of land in San Bernardino County, California, and the construction of a building (the Property). Robert Lemelin (Robert), Leo Lemelin (Leo), Brian Lemelin (Brian), and Scott Seideman personally guaranteed the loan. After Colonial Bank failed, Branch Banking & Trust Company (the Bank) acquired the L&S loan from the Federal Deposit Insurance Corporation (the FDIC). L&S defaulted on the loan, and the Property was sold at a nonjudicial foreclosure sale. The Bank then filed this action seeking to recover from L&S and the

four guarantors the deficiency between the outstanding balance on the loan and the foreclosure sale price. After a bench trial, the trial court rendered judgment that the Bank take nothing from L&S and Seideman, but recover from the Lemelins, jointly and severally, actual damages of $5,070,172.22, attorneys' fees of $179,230.95, expenses of $13,170.37, and three-fifths of the court costs. The trial court also ordered that, if Robert, Leo, or Brian unsuccessfully appealed the trial court's judgment, that person would be responsible for additional appellate attorneys' fees.

The Bank appealed the trial court's judgment in favor of L&S and Seideman, Seideman filed a cross-appeal, and the Lemelins appealed the trial court's judgment in favor of the Bank. In its appeal, the Bank asserts in four issues that the trial court erred by ordering the Bank take nothing on its claims against L&S and Seideman because (1) Seideman contractually waived all pleaded affirmative defenses, (2) the Bank provided proper notice of the foreclosure sale to L&S and Seideman, (3) L&S's and Seideman's affirmative defenses of fraud, waiver, and estoppel were barred by the statute of frauds and, alternatively, the evidence was legally and factually insufficient to support those defenses, and (4) the California anti-deficiency statute does not bar the Bank's claims against L&S. Seideman, in a cross-issue, and the Lemelins, in the first issue of their appeal, argue the trial court erred by determining the California anti-deficiency statute does not bar the Bank's claims against the guarantors. In an additional issue, the Lemelins contend the trial court erred by entering judgment against them on their affirmative defenses of fraud, waiver, and estoppel because those defenses were based on the same facts as Seideman's affirmative defenses and, alternatively, the evidence was legally and factually insufficient to support the trial court's judgment.

We conclude the California anti-deficiency statute does not bar the Bank's claims against L&S or the guarantors. We further conclude the statute of frauds bars the affirmative defenses of fraud, waiver, and estoppel and Seideman contractually waived any defense based on lack of notice

of the foreclosure sale. Accordingly, we affirm the trial court's judgment against the Lemelins and reverse the trial court's judgment in favor of L&S and Seidman. We render judgment that the Bank recover its actual damages of $5,070.172.22 from the Lemelins, L&S, and Seidman, jointly and severally. Because we have significantly changed the trial court's judgment, we reverse the trial court's judgment as to the assessment of attorneys' fees, expenses, and court costs and remand this case to the trial court for reassessment of the parties' liability for those fees and expenses.

**Background**

L&S is a California limited liability company owned by Seideman and the Lemelins. In 2007, Seideman, an attorney, was licensed to practice and lived in Texas. Further, Seideman's law firm had a "rather extensive banking relationship" with Colonial Bank in Texas. Effective June 29, 2007, L&S borrowed $8,870,524 from Colonial Bank. Robert, as L&S's manager, and the Lemelins and Seideman, as guarantors, signed a Loan Agreement that required L&S to execute a promissory note (the Note) and a deed of trust (the DOT) for the Property that secured the Note and required Seideman and the Lemelins to execute guaranty agreements. Under the Loan Agreement, an "event of default" included L&S's failure to pay when due any installment of principal or interest or any other monetary obligation arising under the Note. The Loan Agreement provided that:

> THE NOTE AND THIS AGREEMENT ARE EXECUTED AND DELIVERED IN CONNECTION WITH A LENDING TRANSACTION NEGOTIATED AND CONSUMMATED IN DALLAS COUNTY, TEXAS, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

The parties agreed the Loan Agreement "embodie[d] the entire agreement between the parties relating to the subject matter hereof" and could be amended only by a written instrument executed by both L&S and Colonial Bank.

The Note required L&S to make monthly payments of principal and interest at Colonial Bank's offices in Dallas or Collin County, Texas, unless a different place was designated by Colonial Bank in writing. The Note provided that L&S and any guarantor of the Note waived presentment for payment, demand, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, grace, diligence in collecting the Note or enforcing any security for the Note, or "any other notices" or action. The Note stated:

> THIS NOTE IS EXECUTED AND DELIVERED IN CONNECTION WITH A LENDING TRANSACTION NEGOTIATED AND CONSUMMATED IN DALLAS COUNTY, TEXAS, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

Section fourteen of the DOT gave the trustee a power of sale in the event L&S defaulted under the Note or the Loan Agreement. The foreclosure sale was required to be conducted in California, and the trustee was required to give notice of the sale "in accordance with applicable laws in the State of California in effect at the time such notice is given." Section fourteen of the DOT also specified notice was to be served, at least twenty days preceding the sale, by certified mail on "each debtor obligated to pay the debt secured hereby according to the records" of Colonial Bank. Section thirty-six of the DOT stated the instrument was executed in Texas and "shall be governed by and construed in accordance with the laws of the State of Texas, except to the extent such laws have been preempted by federal laws, in which case federal laws as applied in Texas shall govern."

The Lemelins and Seideman each signed a Guaranty Agreement, in which they "unconditionally, absolutely and irrevocably" guaranteed the prompt payment when due of "any and all indebtedness or other liability, fixed or contingent, which [L&S] may now or at any time hereafter owe" Colonial Bank. The guarantors waived diligence on the part of Colonial Bank in the collection of the indebtedness as well as "presentment, protest, dishonor, notice of acceptance

–4–

of [the guaranties], notice of non-performance, notice of acceleration, demands for performance and approval of any modifications, renewals or extensions of the indebtedness" that might be granted to L&S. Each guarantor agreed the guaranty would not be "discharged, impaired or affected" by "any defense (other than the full payment of the indebtedness hereby guaranteed in accordance with the terms hereof) that [he] may or might have" and that "each and every such defense" was waived. Each guarantor also waived all rights and remedies he might have under chapter 34 of the Texas Business and Commerce Code or under sections 51.003, 51.004, and 51.005 of the Texas Property Code, including the "right to seek an offset of any deficiency judgment based on the fair market value" of the Property. Each guarantor agreed the contract was "performable in the City of Dallas, Dallas County, Texas."

Finally, Jeff Chase, as Colonial Bank's City President-Frisco, Robert, as L&S's manager, the Lemelins, and Seideman signed a "Statute of Frauds Notice." The notice specifically referred to "several instruments, agreements and documents relating to, among other things, a certain $8,870,524.00 commercial real estate loan from [Colonial Bank] to [L&S] which is guaranteed by [the Lemelins and Seideman]." The parties agreed the "written documents, agreements and instruments referred to" represented the "final agreements between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties" and that "[t]here [were] no unwritten oral agreements between the parties."

In 2009, Colonial Bank was determined to have insufficient capital, and the FDIC was appointed as the receiver for Colonial Bank. On August 14, 2009, the Bank and the FDIC entered into a Purchase and Assumption Agreement pursuant to which the Bank acquired the Note.

L&S began having difficulty making payments on the Note and, in October 2012, Robert Holmes, a senior vice president in the Bank's Problem Loan Administration Department, met with the Lemelins at the Property. The Lemelins testified that, at the meeting, Holmes told them the

options for resolving the situation included judicial foreclosure, nonjudicial foreclosure, and the short sale[1] of the Property. According to the Lemelins, Holmes stated that, if the Bank pursued either nonjudicial foreclosure or approved a short sale, it would not seek to recover the deficiency between the balance owed on the Note and the sale or purchase price from either L&S or the guarantors. Brian and Robert testified Holmes also told them that it would assist the Bank if the Property was vacant. At the time, Lexxiom, Inc., a company owned by the Lemelins, and Seideman's California law office were tenants of L&S at the Property. In reliance on Holmes's statements, Lexxiom and Seideman's law firm moved out of the Property by March 2013. The Property was subsequently vandalized and significantly damaged. After consultation with Holmes, L&S filed a claim on its insurance policy and the damage to the Property was repaired.

Although a number of short-sale offers were made for the Property, the Bank did not approve any of the sales. Instead, in August 2013, the Bank appointed First American Title Insurance Company as the substitute trustee under the DOT. David Bark, an attorney employed by First American, testified that, on August 28, 2013, a notice of default and election to sell the Property was mailed to L&S and the guarantors. Bark further testified that, on December 11, 2013, a notice of sale was mailed to L&S and the guarantors. The record indicates these documents were mailed to the addresses in the Note and the guaranties. The Property was sold at a foreclosure sale on February 10, 2014. After crediting the net proceeds from the foreclosure sale to the principal amount owed on the Note, the Bank filed this lawsuit, seeking to recover the outstanding balance of principal and interest from L&S and the guarantors.

Seideman testified he did not receive either the notice of default or the notice of sale and did not learn of the foreclosure sale until after it had occurred. According to Seideman, he no

---

[1] "A 'short sale' is a sale of property for a price that is less than the amount of debt on the property, resulting in a shortfall of sales proceeds to pay off the existing loans." *Lawyers Title Ins. Corp. v. Dedmore*, No. A136422, 2014 WL 4354663, at *5 (Cal. Ct. App. Sept. 3, 2014) (unpublished) (quoting 4 MILLER & STARR, CAL. REAL ESTATE (3d ed. 2011, 2013–2014 Supp.))

longer lived at the address specified in the guaranty, the Bank was aware he no longer lived at that address, and the Bank had sent statements relating to the Note to his business address. Seideman believed he informed the Bank of his new address through the financial statements he was required to file periodically. He conceded, however, that the guaranty required any change of address to be sent by certified mail, and he could not recall if he provided the Bank with notice of his new address by certified mail. According to Seideman, if he had known the Bank was going to foreclose on the Property, he would have brought the loan current to prevent the foreclosure.

After a bench trial, the trial court rendered judgment that the Bank recover the deficiency from the Lemelins, but take nothing from L&S or Seidman. In response to the Bank's request, the trial court made findings of fact and conclusions of law as to the Bank's claims against Seideman.[2] As relevant to this appeal, the trial court found neither the Bank nor the substitute trustee provided notice of the foreclosure sale to Seideman, preventing Seideman from protecting his interest as a guarantor. Further, Seideman and other of the building's tenants voluntarily vacated the Property based on Holmes's representations that, if they did so, the Bank would engage in a short sale and would not seek to recover any deficiency from L&S or the guarantors. The trial court found that, if the Bank had told Seideman the truth, he would not have voluntarily vacated the premises. The trial court concluded the Bank's claims against Seideman were barred because it failed to provide proper notice of the foreclosure sale as required by the DOT and because Seideman established his affirmative defenses of fraud, waiver, and estoppel.

The trial court also made findings of fact and conclusions of law in response to the Lemelins' request. The trial court concluded that Texas law applied to the "transactions that form the basis of the case and [the Bank's] claims," but California law applied "to the foreclosure of the

---

[2] The Bank also requested findings of fact and conclusions of law as to its claims against L&S. Although the trial court did not make the requested findings and conclusions, the Bank has not complained on appeal about the trial court's failure to do so.

Property in California." The trial concluded the foreclosure of the Property was done in compliance with California law and the DOT, and the Lemelins failed to comply with their obligations to the Bank under the guaranties.

## Standard of Review

In an appeal from a bench trial, the trial court's findings of fact carry the same weight as a jury verdict upon questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Scott Pelley P.C. v. Wynne*, No. 05–15–01560–CV, 2017 WL 3699823, at *8 (Tex. App.—Dallas Aug. 28, 2017, pet. denied) (mem. op.). We thus review findings of fact by the same standards that are applied in reviewing the legal and factual sufficiency of the evidence supporting a jury finding. *Anderson*, 806 S.W.2d at 794; *Scott Pelley P.C.*, 2017 WL 3699823, at *8. Unchallenged findings of fact are binding on this Court unless the contrary is established as a matter of law or there is no evidence to support the finding. *Walker v. Anderson*, 232 S.W.3d 899, 907 (Tex. App.—Dallas 2007, no pet.); *see also Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 526 (Tex. 2014) (concluding unchallenged findings supported by some evidence were binding on appellate court); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794–95 (Tex. 2002); *Credit Suisse AG v. Claymore Holdings, LLC*, No. 05–15–01463–CV, 2018 WL 947902, at *4 (Tex. App.—Dallas Feb. 20, 2018, no pet. h.) (mem. op.). We may not reverse a trial court's conclusion of law unless it is erroneous as a matter of law. *Credit Suisse AG*, 2018 WL 947902, at *4. We will uphold the trial court's judgment if it can be sustained on any legal theory supported by the evidence. *Villages of Sanger, Ltd. v. Interstate 35/Chisam Rd., L.P.*, No. 05-16-00366-CV, 2018 WL 703327, at *2 (Tex. App.—Dallas Feb. 5, 2018, no pet.) (mem. op.) (citing *Marchand*, 83 S.W.3d at 794).

**Impact of California Anti-Deficiency Statute on the Bank's Claims**

The first possible basis for the trial court's judgment is that the California anti-deficiency statute barred the Bank's claims against the borrower, L&S, but did not bar the Bank's claims against the guarantors. In its fourth issue, the Bank asserts the trial court erred by determining the California anti-deficiency statute barred its claims against L&S, while Seideman, in his cross-issue, and the Lemelins, in their first issue, argue the trial court erred by determining the California anti-deficiency statute did not bar the Bank's claims against the guarantors.

California has enacted an "elaborate and interrelated set of foreclosure and antideficiency statutes relating to the enforcement of obligations secured by interests in real property." *All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 606 (Cal. 1995). Pursuant to the statutory scheme, foreclosure, either judicial or nonjudicial, is the "one form of action" for the "recovery of any debt or the enforcement of any right secured by a mortgage or deed of trust." *Id.* In a nonjudicial foreclosure, or "trustee's sale," such as occurred in this case, a trustee exercises the power of sale given by a deed of trust. *Id.* at 606–07. Following a nonjudicial foreclosure, the creditor may not seek to recover a deficiency judgment. *Id.* at 607.

In 2007, when L&S and the guarantors signed the loan documents, and in 2013, when the Bank instituted the nonjudicial foreclosure process, section 580d of the California Civil Code provided, as relevant to this appeal:

> No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property or an estate for years therein hereafter executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust.

1989 Cal. Legis. Serv. ch. 698, § 13.[3] Section 580d prohibits a creditor who elects to conduct a nonjudicial foreclosure from seeking to recover from a borrower any deficiency between the amount of the debt owed by the borrower and the sale price. *Id.*; *Yvanova v. New Century Mortg. Corp.*, 365 P.3d 845, 850 (Cal. 2016) ("Generally speaking, the foreclosure sale extinguishes the borrower's debt; the lender may recover no deficiency."). Texas does not have a similar anti-deficiency law. *See* TEX. PROP. CODE ANN. § 51.003(a) (West 2014) ("If the price at which real property is sold at a foreclosure sale under Section 51.002 is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section."); *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 555 (Tex. 2015) (concluding that section 51.003 governs suit against borrower "after real property is sold at a foreclosure sale. . . and judgment is sought against the borrower because the foreclosure sales price is less than the amount owed").

The parties agreed that Texas law would apply to the Note and the guaranties would be performed in Texas. The DOT also stated that it was executed in Texas and would be "governed by and construed in accordance with the laws of the State of Texas, except to the extent such laws have been preempted by federal laws[.]" The DOT also stated, however, that California law applied to any sale of the Property by a trustee under the power of sale, specifically providing that

---

[3] As relevant to this appeal, effective January 1, 2014, the California Legislature amended section 580d to state:

> (a)  Except as provided in subdivision (b), no deficiency shall be owed or collected, and no deficiency judgment shall be rendered for a deficiency on a note secured by a deed of trust or mortgage on real property or an estate for years therein executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust.

> (b)  The fact that no deficiency shall be owed or collected under the circumstances set forth in subdivision (a) does not affect the liability that a guarantor, pledgor or other surety might otherwise have with respect to the deficiency, or that might otherwise be satisfied in whole or in part from other collateral pledged to secure the obligation that is the subject of the deficiency.

2013 Cal. Legis. Serv. ch. 65, § 3 (codified at CAL. CIV. PROC. CODE § 580d (West, Westlaw current through ch. 2 of 2018 Reg. Sess.)). The California Legislature specifically found and declared that this "measure is not intended to and does no impact existing law regarding the liability of a guarantor, pledgor or other surety may have with respect to a deficiency, nor does it impact existing law regarding other collateral pledged to secure an obligation that is the subject of a deficiency." *Id.* § 1; *see also CRE-Venture 2011-2, LLC v. Dowdy*, No. D070549, 2017 WL 2953178, at *6 n.12 (Cal. Ct. App. July 11, 2017) (unpublished).

"notice of the time, place and terms of said sale, and of the property to be sold [will be provided] in accordance with applicable laws in the State of California in effect at the time such notice is given." The parties do not dispute that the foreclosure sale was conducted pursuant to California law and have not challenged the validity of that sale. The issue, therefore, is whether California law applies beyond the foreclosure sale to prevent the enforcement of the Note and the guaranties pursuant to Texas law.

Generally, parties may resolve uncertainty as to which jurisdiction's laws will govern their performance under a multi-jurisdictional contract by including a choice-of-law provision in the agreement. *DeSantis v. Wackenhut, Corp.*, 793 S.W.2d 670, 677 (Tex. 1990); *Gator Apple, LLC v. Apple Tex. Rests., Inc.*, 442 S.W.3d 521, 532 (Tex. App.—Dallas 2014, pet. denied). However, parties "cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement" and "cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply." *DeSantis*, 793 S.W.2d at 677; *see also Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014).

Both Texas and California follow the principles in the Restatement (Second) of Conflict of Laws in determining the enforceability of contractual choice-of-law provisions. *See Drennen*, 452 S.W.3d at 324; *Nedlloyd Lines B.V. v Superior Court*, 834 P.2d 1148, 1151 (Cal. 1992). Pursuant to section 186 of the Restatement, "[i]ssues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188." RESTATEMENT (SECOND) CONFLICT OF LAWS § 186 (1971); *see also Sonat Exploration Co. v. Cudd Pressure Control Inc.*, 271 S.W.3d 228, 231 (Tex. 2008).

Section 187(1) of the Restatement provides that the law of the state chosen by the parties will be applied to govern their contractual rights and duties if the specific issue was "one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

RESTATEMENT § 187(1). Examples of issues that cannot be resolved by contractual choice-of-law provisions include capacity, enforceability, formalities, and validity. *See id.* § 187 cmt. d; *DeSantis*, 793 S.W.2d at 678. Issues that can be resolved by agreement include construction, conditions precedent and subsequent, and performance. *See* RESTATEMENT § 187 cmt. c; *Gator Apple, LLC*, 442 S.W.3d at 532.

In this case, L&S and the guarantors argue the Note and the guaranties are not enforceable under California law. Whether a contract is enforceable is not an issue the parties could resolve by explicit agreement. *See DeSantis*, 793 S.W.2d at 678; *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 170 n.11 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (en banc) (noting parties could not have resolved issue of validity of indemnity by express agreement because Louisiana law (if applicable) would make agreements void).[4] Accordingly, section 187(1) does not control the analysis in this case.

Section 187(2) of the Restatement provides that the law of the state chosen by the parties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to the issue, unless either:

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

---

[4] In *Chase Manhattan Bank, N.A. v. Greenbriar North Section II*, 835 S.W.2d 720, 722–23 (Tex. App.—Houston [1st Dist.] 1992, no writ), a case involving a lender's attempt to recover a deficiency judgment following the foreclosure sale of real property located in Texas, the parties agreed in the promissory note that New York law applied. The court determined the requirement under the New York anti-deficiency statute that a party seek an order confirming the sale of real property within ninety days of the sale's consummation and obtain a judicial determination of the property's fair market value was a condition precedent, an issue on which the parties could reach an express agreement, and that section 187(1) therefore applied to require the application of New York law. *Id.* at 724–25. In contrast, the California anti-deficiency statute, if applicable, would prohibit the Bank from enforcing the provisions of the Note following a nonjudicial foreclosure sale, an issue the parties could not resolve by explicit agreement. *See id.* at 724 ("The parties to an agreement are not the ones who determine its enforceability." ).

RESTATEMENT § 187(2).[5] "[P]arties will be held to their choice when 'the state of the chosen law [has] a sufficiently close relationship to the parties and the contract to make the parties' choice reasonable.'" *Drennen*, 452 S.W.3d at 325 (quoting RESTATEMENT § 187 cmt. f).

Turning first to the exception in section 187(2)(a), in 2007, Seideman was a resident of Texas, licensed to practice law in Texas, and had a "rather extensive banking relationship" with Colonial Bank in Texas. The Loan Agreement was negotiated and consummated in Texas, and L&S was obligated to perform on the contract by making payments to Colonial Bank in Texas. The guarantors agreed their obligations under the guaranties were performable in Dallas County and waived the right to be sued anywhere but Dallas County. Although the Property securing the debt was in California, the underlying obligations (the Note and the guaranties) were clearly related to Texas. We conclude that, under these circumstances, Texas had a substantial relationship to the parties and the transaction, and section 187(2)(a) of the Restatement does not preclude the application of Texas law to the Bank's claims based on the Note and the guaranties. *See In re J.D. Edwards World Sols. Co.*, 87 S.W.3d 546, 549 (Tex. 2002) (orig. proceeding) (per curiam) (concluding Colorado had substantial relationship to parties and their transaction because one party had office in Colorado and other party contracted with Colorado office and received assistance from personnel in that office); *Res. Sav. Ass'n v. Neary*, 782 S.W.2d 897, 903 (Tex. App.—Dallas 1989, writ denied) (Texas had reasonable relationship to parties and their transaction, even though real property was located in Georgia, because promisor on note was Texas partnership, promisee on note was located in Texas, indebtedness was payable at promisor's office in Texas, guarantors lived in Texas, guarantors agreed their obligations under guaranty were performable in Texas, and parties agreed Texas law would apply to contract).

---

[5] Section 188 of the Restatement addresses the law governing the rights and duties of the parties in the absence of an effective choice of law. RESTATEMENT § 188.

We next consider whether section 187(2)(b) of the Restatement precludes application of Texas law to the Note and the guaranties. Section 187(2)(b) provides that the law chosen by the parties will not be enforced if (1) there is a state with a more significant relationship with the parties and their transaction, (2) applying the chosen law would contravene a fundamental policy of that state, and (3) that state has a materially greater interest in the determination of the particular issue. *See DeSantis*, 793 S.W.2d at 678; *Gator Apple, LLC*, 442 S.W.3d at 533. We must enforce the parties' choice-of-law unless all three elements of this test are satisfied. *Gator Apple, LLC*, 442 S.W.3d at 533.

The first determination under section 187(2)(b) is "whether there is a state the law of which would apply under section 188 of the Restatement absent an effective choice of law by the parties." *Drennen*, 452 S.W.3d at 325 (quoting *DeSantis*, 793 S.W.2d at 678). "This inquiry evaluates 'whether a state has a more significant relationship with the parties and their transaction than the state they chose.'" *Id.* at 325–26 (quoting *DeSantis*, 793 S.W.2d at 678). The factors we consider in conducting this analysis include "the locations of the parties, the location of negotiations of the agreement, the location of the execution of the agreement, and the place of performance." *Id.* at 326; *see also* RESTATEMENT § 188(2); *DeSantis*, 793 S.W.2d at 678–79. These factors, in turn, are to be taken into account "in light of the basic conflict of law principles of section 6 of the Restatement." *DeSantis*, 793 S.W.2d at 678 & n.2.[6] In conducting our analysis, we focus on which

---

[6] The factors listed in section 6 of the Restatement are:

    (a) the needs of the interstate and international systems;
    (b) the relevant policies of the forum;
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
    (d) the protection of justified expectations;
    (e) the basic policies underlying the particular field of law;
    (f) certainty, predictability, and uniformity or result; and
    (g) ease in the determination and application of the law to be applied.

RESTATEMENT § 6.

state's law "has the most significant relationship *to the particular substantive issue to be resolved*." *Chesapeake Operating, Inc.*, 94 S.W.3d at 171.

Here, "the particular substantive issue to be resolved" is whether, after the foreclosure sale, the Bank can recover the amount outstanding on the Note from either L&S or the guarantors. The lending transaction that forms the basis of the Bank's claim was negotiated and consummated in Texas. Further, L&S and the guarantors were required to perform on the Note and the guaranties in Texas. Accordingly, Texas has the most significant relationship to the particular substantive issue to be resolved, and we must respect the parties' choice to apply Texas law to their dispute.

However, we believe the result would the same even if California was the state with the most significant relationship to this dispute. "Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." RESTATEMENT § 187 cmt. e; *see also Drennen*, 452 S.W.3d at 330. "In multistate transactions, these prime objectives 'may best be attained . . . by letting the parties choose the law to govern the validity of the contract.'" *Drennen*, 452 S.W.3d at 330 (quoting RESTATEMENT § 187 cmt. e). Because the parties chose Texas law in their contract, that choice can be disregarded under section 187(b)(2) of the Restatement only if it contravenes a fundamental policy of California and California has a materially greater interest in the determination of the Bank's deficiency claim than does Texas.

Neither the Restatement nor the Texas Supreme Court has adopted a general definition of "fundamental policy." *Drennen*, 452 S.W.3d at 327. However, in *Guardian Savings & Loan Ass'n v. MD Assocs.*, 64 Cal.App.4th 309, 317–322 (1998), a case involving real property located in California but security instruments containing a Texas choice-of-law provision, the California First District Court of Appeals concluded that section 580b of the California anti-deficiency statutes

–15–

reflected a fundamental policy of California.[7]   The court recognized California's interest in enforcing the policies underlying section 580 was based on homeowner protection, equitable risk allocation, and "avoiding the aggravation of an economic downturn in a depression."  *Id.* at 318. Those interests, however, had limited impact when the transaction did not involve the sale of a home and the parties were sophisticated Texas domiciliaries.  *Id*. at 322–23.  Under those circumstances, California's interest in enforcing its anti-deficiency statute was not materially greater than Texas's interest in protecting the contractual expectations of Texas domiciliaries.  *Id.* at 323.

Although it did not analyze the issue under section 187 of the Restatement, the California Second District Court of Appeals reached a similar conclusion in *Kerivan v. Title Ins. & Trust Co., Inc.*, 147 Cal.App.3d 225 (1983).  In *Kerivan*, the purchase of property in California was secured by a note subject to the laws of Colorado. *Id.* at 228, 230.  After the property was sold at a nonjudicial foreclosure sale, the lender sued the borrower on the note in Colorado and obtained a deficiency judgment.  *Id.*  The borrower filed suit in California against the trustee who conducted the foreclosure sale, asserting the trustee was negligent by failing to cancel the note after the sale. *Id*.  The trial court granted the trustee's general demurrer and dismissed the case.  *Id.*

The appellate court considered whether, following a nonjudicial foreclosure sale of property in California, "ancillary or supplementary actions may be brought in a sister state."  *Id.* at 229–30.  Consistent with section 229 of the Restatement,[8] the court noted a number of

---

[7] Section 580b "proscribes a deficiency judgment after any sale of real property under a deed of trust or mortgage, given to the vendor to secure payment of the balance of the purchase price[.]"  *Spangler v. Memel*, 498 P.2d 1055, 1058 (Cal. 1972).

[8] Section 229 of the Restatement provides that the "method for the foreclosure of a mortgage on land and the interests in the land resulting from the foreclosure are determined by the local law of the situs."  Restatement § 229.  Comment e addresses issues that are collateral to foreclosure:

> Issues which do not affect any interest in the land, although they do relate to the foreclosure, are determined . . . by the law which governs the debt for which the mortgage was given.  Examples of such latter issues are the mortgagee's rights to hold the mortgagor liable for any deficiency remaining after foreclosure or to bring suit upon the underlying debt without having first proceeded against the mortgaged land.

*Id.*; *see also Kerivan*, 147 Cal.App.3d at 231.

–16–

jurisdictions outside of California had concluded a "foreign antideficiency statute at the situs of the mortgaged property, would not protect the mortgagee against an in personam deficiency action in the forum." *Id*. at 231. The court noted the reasoning behind these opinions was that a "foreign statute does not extinguish the permissible deficiency, but merely limits the remedy. The remedial measure in one state would not prevent a recovery of the deficiency in another state." *Id.*

The court concluded section 580d "refers only to a judgment rendered in this state and not to a judgment pursued in a state allowing deficiencies following foreclosure sales." *Id.* at 231. Accordingly, the borrower was entitled to the protection of section 580d when the laws of California were "applicable to the transaction," but not when the lender could "seek a deficiency judgment in a jurisdiction other than" California. *Id*.; *see also Consol. Capital Income Trust v. Khaloghli*, 183 Cal.App.3d 107, 111, 112 (1986) (concluding "suit on the deficiency is a suit on the note without regard to the deed or the location of the property" and "law of the situs of the debt controls when the suit is brought against the debt (or a guaranty) and not the land").[9] Texas courts, including this one, have reached a similar conclusion. *See Neary*, 782 S.W.2d at 902–03 (concluding that, although property securing note was located in Georgia, Texas law applied to proceeding to recover deficiency based on guaranty and guarantors were not entitled to protections of Georgia law); *First Commerce Realty Inv'rs v. K-F Land Co.*, 617 S.W.2d 806, 808 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (concluding that, although questions concerning title to real estate, including foreclosures, are determined by the law of the situs, "the general rule is that the law of the state where the contract is made controls with respect to validity, interpretation and obligations under the contract.").

_____

[9] *See also United Bank of Denver v. K&W Trucking Co., Inc.*, 147 Cal.App.3d 217, 223 (1983) (concluding that because California's public policy, as expressed in section 580d, is not "pervasive" in California law and deficiency judgments are not "inherently objectionable," deficiency judgment in sister state following foreclosure sale of California property was "not so offensive as to compel this court to recognize an exception to the full faith and credit clause of the United States Constitution"); *Younker v. Manor*, 255 Cal.App.2d 431, 436–37 (1967) (concluding section 580b, another portion of California's anti-deficiency statutes, applied to preclude lender from obtaining deficiency judgment against California guarantor, but law of Nevada, the situs of property, applied to "real property" aspects, including means of foreclosure).

–17–

In this case, at the time the parties consummated the transaction, Seideman was a domiciliary of Texas, Colonial Bank conducted business in Texas, and the Lemelins and L&S were domiciliaries of California. The parties entered into a large commercial transaction that was performable in Texas, but involved property located in California. The parties chose Texas law to apply to their agreement. Under these circumstances, California's interest in enforcing its anti-deficiency statute is not materially greater than Texas's interest in protecting the contractual expectations of the parties. *See Guardian Sav. & Loan Ass'n*, 64 Cal.App.4th at 323; *see also Kerivan*, 147 Cal.App.3d 231.

The parties agreed that Texas law would apply to the Note and to the DOT in all instances other than the procedures governing the trustee's sale of the Property under the power of sale and that the guarantors' obligations under the guaranties were performable in Texas. Under the principles in section 187 of the Restatement, we must give effect to that choice. Pursuant to Texas law, a claim for a deficiency following foreclosure on real property "is an action involving enforcement of the underlying debt. It is not an action arising out of the real estate foreclosure." *Neary*, 782 S.W.2d at 902–03; *see also First Commerce Realty Inv'rs*, 617 S.W.2d at 809 (concluding that, although real property securing obligation was sold at foreclosure sale in Texas, suit for deficiency against borrower and guarantors related to "enforcement of the underlying debt (the note and the guaranty) and hence is governed by the law of the state [Louisiana] selected by the parties"). Texas law does not prohibit the Bank from seeking to recover that deficiency from L&S and the guarantors. *See* TEX. PROP. CODE ANN. § 51.003; *PlainsCapital Bank*, 459 S.W.3d at 555.

We conclude the trial court erred by determining section 580d of the California anti-deficiency statute precluded the Bank from recovering the deficiency from L&S, but correctly determined section 580d did not bar the Bank from recovering the deficiency from the guarantors.

We resolve the Bank's fourth issue, the Lemelins' first issue, and Seideman's cross-issue in favor of the Bank.

## Affirmative Defenses

The other possible bases for the trial court's judgment in favor of L&S and Seideman was that one or more of the pleaded affirmative defenses barred the Bank's claims. L&S pleaded the affirmative defenses of fraud and estoppel;[10] all the guarantors asserted affirmative defenses of fraud, waiver, and estoppel; and Seideman asserted an additional affirmative defense of lack of notice of the foreclosure sale. In its first three issues, the Bank contends the trial court erred by ordering it take nothing from L&S and Seideman based on any of the pleaded affirmative defenses because (1) Seideman contractually waived all the pleaded defenses, (2) Seideman was properly served with notice of the foreclosure sale,[11] and (3) L&S's and Seideman's pleaded defenses were barred by the statute of frauds or, alternatively, there was insufficient evidence to support the trial court's conclusion Seideman established the affirmative defenses of fraud, waiver, and estoppel. In their second issue, the Lemelins argue that, because the trial court concluded Seideman established the affirmative defenses of fraud, waiver, and estoppel, it erred by failing to conclude the Lemelins established those same affirmative defenses or, alternatively, there is insufficient evidence to support the trial court's judgment.

### *Relevant Facts*

In its petition, the Bank's claims were based on the Note and the guaranties, and it attached those documents, as well as the DOT, to its pleading. The Bank specifically pleaded the guarantors contractually waived any right to seek an offset based on the fair market value of the Property at the time of the foreclosure sale. In its original answer, L&S asserted the affirmative defenses of

---

[10] On appeal, L&S states it did not assert the affirmative defense of waiver.

[11] The Bank also argues that L&S was properly served with notice of the foreclosure sale. In its appellate brief, L&S states it is not contending it did not receive proper notice of the foreclosure sale.

fraud and estoppel based on the Bank's representation that it would not pursue a deficiency if L&S vacated the Property voluntarily. In their amended answers, the guarantors pleaded the affirmative defenses of fraud, waiver, and estoppel based on the same facts. Seideman pleaded an additional defense of lack of notice of the foreclosure sale.

The Bank did not amend its petition after these answers were filed and did not plead that L&S's and the guarantors' asserted defenses were barred by either the statute of frauds or the contractual waivers. Prior to trial, the parties filed a Joint Pre-Trial Submission. The Bank did not include in its statement of contentions that the affirmative defenses were precluded by either the statute of frauds or the contractual waivers. Included in the parties' exhibit list as "agreed" exhibits were the four guaranties and the statute of frauds notice. All four guaranties and the statute of frauds notice were admitted into evidence.

Holmes did not remember any conversations he had with the Lemelins about the Bank not seeking a deficiency if the Property was sold through a short sale, but denied that he told the Lemelins the Bank would not seek a deficiency if they moved out of the building. After the Bank asked Holmes about the purpose of the statute of frauds notice, the trial court stated it knew "what the purpose [was]." Holmes then testified he never executed any written modifications or changes to any of the loan documents, there were no written changes to any of the documents while he was working on the loan, and there was no written agreement that the Bank would not seek a deficiency if L&S and the Lemelins vacated the building.

Brian testified he, Robert, and Leo attended the October 2012 meeting with Holmes. Holmes explained in some detail the options of judicial foreclosure, nonjudicial foreclosure, and a short sale, but did not tell them that short sales were very difficult and rarely approved by the Bank. According to Brian, Holmes told them that, in the event of a nonjudicial foreclosure or a short sale, L&S and the guarantors would be released from any remaining obligation on the Note. Holmes

also told them one of the "larger challenges" for the Bank was a tenant remaining in the building and that it would "help" the Bank if L&S and its tenants vacated the building. Brian acknowledged he signed the statute of frauds notice and testified that, to his knowledge, there were no written modifications or changes to his guaranty. He also admitted there was no email that "recapped the high points" of the meeting with Holmes.

Although it was difficult and expensive, L&S vacated the premises voluntarily. The Lemelins told Seideman about the meeting and, according to Brian, Seideman's law firm vacated the Property "for the same reasons that our company moved out." The Lemelins also "pushed" L&S's broker to obtain offers to purchase the Property. Brian testified that, if they had not believed L&S would be relieved of liability for the deficiency, Lexxiom would not have voluntarily moved from the Property when it did notwithstanding a need to "manage expenses."

According to Brian, the Property was vandalized after they moved out of the building. After discussing the damage to the Property with Holmes, Brian had an understanding L&S "should move forward to get the building back to the position it was in when the building was shown" to some of the buyers who had made offers to purchase the Property. Brian testified they "were offering up a claim" on L&S's insurance and doing everything they could "to present this building in the best light," so that the Property could be sold "in order to relieve us from any kind of liability." If they had not "been under the impression" the guarantors would not be subject to a deficiency action, they would not have agreed to make an insurance claim to repair damage to property they were about to lose to foreclosure.

After the Property was sold at the foreclosure sale, Holmes requested a "write-up" from the Lemelins regarding their financial circumstances. On March 5, 2014, Brian sent an email to Holmes describing Lexxiom's business model and how, at its peak, it provided support services to six law firms who represented over 80,000 clients with consumer debt issues. The email indicated

that, in 2010, the Federal Trade Commission amended its Telemarketing Sales Rule so that it applied to the sale of debt settlement services and specifically included attorneys within the scope of the regulations. The amended rule reportedly required significant disclosures to consumers, prohibited the charging of advance fees for debt settlement services, and limited the fees that could be charged for those services. The impact of the amended rule was significant. According to the email, most debt settlement companies either "ceased doing business" or dramatically reduced their operations. The attorneys L&S provided services to "mostly decided to not take on new consumer clients while an evaluation was made as to whether an effective business model could exist under the new rules."

Brian also stated in the email that, before the regulatory changes occurred, Lexxiom had obtained a line of credit with Bank of America (BOA) for $2,000,000, which the Lemelins had personally guaranteed. Because of the negative financial impact of the new regulations, Lexxiom was unable to repay BOA. Further, there was a dispute between BOA and Lexxiom about BOA's charges for processing fees. These "very difficult financial problems" were further exacerbated by the ongoing recession. According to Brian's email, Lexxiom had reduced its workforce from over 400 employees to less than fifty by March 2014. "[T]o try to manage our expenses," Lexxiom moved out of the Property to attempt to short-sell it and moved to a much smaller building in a nearby community. At trial, Brian explained that "managing their expenses" meant they were attempting to "live within [their] means at that point" and "manage the overall expenses of running a business in a building at that time." He agreed that "[p]art of the reason [they] exited the [Property] was to cut down the expenses."

Brian finally stated in the March 4, 2014 email that, in September 2013, BOA sued Lexxiom and the Lemelins for over $3,000,000, and Lexxiom and the Lemelins explored the option of filing for bankruptcy. In March 2014, they reached a settlement with BOA that would

allow them to avoid filing for bankruptcy protection "at least for now." The Lemelins had agreed to "make very substantial payments" to BOA and had been forced to "collateralize the agreement with all [their] personal and business assets."

Robert testified Holmes said at the October 2012 meeting that judicial foreclosure was a long, expensive process and would not be "beneficial for anybody involved." The remaining solutions, a nonjudicial and a short sale, were "more helpful, more beneficial to both sides." Robert testified Holmes wanted them to move out of the building. Robert did not leave the meeting "with the impression that, in the event of a short sale, [he] might be on the hook for a deficiency." Robert never saw a written agreement that outlined the three options discussed at the meeting.

Leo testified he had a "faint recollection" from the testimony at trial that was "pretty consistent with what he left the meeting [with Holmes] understanding." He had the "same impression" as Brian and Robert following that meeting. Leo did not believe L&S would have vacated the building when it did if they had not had the impression the Bank was not "going to come after" them for the deficiency. Leo was not aware of any written agreement "coming out" of the meeting with Holmes or of any written communications confirming anything that was discussed at the meeting.

Seideman was not at the October 2012 meeting with Holmes, but it was his understanding after the meeting that they needed to cooperate with the Bank in vacating the Property and making it saleable. The impetus for leaving the building was what Holmes said at the meeting, and he would not have vacated the building if Holmes had said the Bank rarely, if ever, approved a short sale of property or that the Bank would pursue the guarantors for any deficiency following a short sale. If the Bank had been "truthful about its intentions," Seideman would have attempted to negotiate with the Bank to "make up the arrears and get current on the loan."

Beginning in at least June 2013, Seideman received statements at his business address from the Bank showing the past due amount on the Note. Some of these statements noted they were a "Guarantor's indirect liability statement." Although Seideman had invested money in the Property and did not want to lose the Property, he did not communicate with the Bank in 2013 about the Note or the guaranties. Seideman testified he signed the statute of frauds notice and was not aware of any written agreement that modified the guaranty that he signed.

During closing arguments, the Bank argued both the statute of frauds and the contractual waivers in the guaranties precluded the pleaded affirmative defenses. The guarantors' attorneys responded substantively to the Bank's arguments. The trial court asked questions of both sides regarding the effect of the statute of frauds and the contractual waivers on L&S's and the guarantors' defenses.

*Preservation*

Seideman and L&S initially argue the Bank waived its reliance on the statute of frauds and the contractual waivers by failing to plead those arguments in the trial court. Texas Rule of Civil Procedure 94 requires that "in a pleading to a preceding pleading," a party must affirmatively plead any "matter constituting an avoidance or affirmative defense," including the statute of frauds and waiver. TEX. R. CIV. P. 94. The purpose of rule 94 is to:

> "[G]ive the opposing party notice of the defensive issue to be tried." It is a rule of fairness that requires the defendant to identify affirmative defenses, involving facts distinct from the elements of the plaintiff's claim, so that the plaintiff may reasonably prepare to rebut or explain them.

*MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014) (quoting *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980)); *see also Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155 (Tex. 2015). Generally, in a bench trial, an affirmative defense that is not pleaded or tried by consent is waived. *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.—Dallas 2005, pet. denied); *see also* TEX. R. CIV. P.

67 (stating that issues not raised by pleadings, but tried by consent, shall be treated as if raised by pleadings).

The trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *Hampden Corp. v. Remark, Inc.*, 331 S.W.3d 489, 495 (Tex. App.—Dallas 2010, pet. denied). Although that discretion is to be exercised liberally in favor of justice, trial by consent is the exception, not the rule, and should not be inferred in doubtful cases. *Id.* Trial by consent "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Id.* (quoting *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex. App.—Dallas 2005, pet. denied)); *see also Med. Imaging Solutions Grp., Inc. of Tex. v. Westlake Surgical, LP*, No. 04-17-00285-CV, 2018 WL 2121359, at *5 (Tex. App.—San Antonio May 9, 2018, no pet. h.).

To determine if an issue was tried by consent, the trial court examines the record not for evidence of the issue, but rather for evidence the issue was tried. *Hampden Corp.*, 331 S.W.3d at 496; *Westlake Surgical, LP*, 2018 WL 2121359, at *5. An unpleaded issue may be deemed tried by consent when the evidence on the issue is developed without objection under circumstances indicating both parties understood the issue was being contested. *Hampden Corp.*, 331 S.W.3d 496; *Westlake Surgical, LP*, 2018 WL 2121359, at *5. An issue is not tried merely because there is evidence on the issue, but can be deemed tried by consent when both parties present conflicting evidence on the subject. *Hampden Corp.*, 331 S.W.3d at 496. On the other hand, an issue is not tried by consent when the evidence relevant to the unpleaded issue is also relevant to a pleaded issue because admitting that evidence would not be calculated to elicit an objection and its admission ordinarily would not prove the parties' "clear intent" to try the unpleaded issue. *Id.*

In this case, the Bank's claims against L&S and the guarantors were based on the loan documents. The Note, the statute of frauds notice, and the guaranties were admitted into evidence

without objection. Holmes, Brian, Robert, and Seideman testified about the statute of frauds notice and the lack of a written agreement modifying the terms of the Note or the guaranties. Both parties argued to the trial court about the effect of the statute of frauds and the contractual waivers on L&S's and the guarantors' affirmative defenses and responded to the trial court's questions on both issues. L&S and the guarantors did not object to the evidence, the arguments, or the trial court's questions on the ground they related to an issue not pleaded by the Bank. We therefore conclude the issue of whether the statute of frauds or the contractual waivers precluded L&S and the guarantors from relying on any of the pleaded affirmative defenses was tried by consent.

*Statute of Frauds*

In its third issue, the Bank argues the trial court erred by rendering judgment in favor of L&S based on its affirmative defenses of fraud and estoppel and in favor of Seideman based on his affirmative defenses of fraud, estoppel, and waiver because those defenses are barred by the statute of frauds. In their second issue, the Lemelins assert that, because the trial court concluded that Seideman established the affirmative defenses of fraud, waiver, and estoppel, it erred by failing to conclude the Lemelins established those same affirmative defenses.

Section 26.02 of the business and commerce code is the statute of frauds applicable to loan agreements involving financial institutions. *See* TEX. BUS. & COM. CODE ANN. § 26.02 (West 2015). Under section 26.02, a loan agreement involving an amount in excess of $50,000, "is not enforceable unless the agreement is in writing and signed by the party to be bound or that party's authorized representative." *Id.* § 26.02(b). "Loan agreement" is broadly defined to include:

> [O]ne or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation. . . .

*Id.* § 26.02(a)(2). Financial institutions include state and federally chartered banks. *Id.* § 26.02(a)(1). Section 26.02(e) requires a financial institution to:

> [G]ive notice to the debtor or obligor of the provisions of Subsections (b) and (c) of this section. The notice must be in a separate document signed by the debtor or obligor or incorporated into one or more of the documents constituting the loan agreement. . . . The notice must state substantially the following:
>
> > "This written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.
> >
> > "There are no unwritten oral agreements between the parties.

*Id.* § 26.02(e). The statute of frauds notice in this case complied with section 26.02.

Both L&S and Seideman allege that Holmes's misrepresentation that the Bank would not pursue a deficiency judgment induced them to vacate the building. Allegations of fraud generally do not preclude application of the statute of frauds, and the supreme court has "rejected attempts to 'use a fraud claim essentially to enforce a contract the Statute makes unenforceable' as an improper circumvention of the statute's purpose." *Knapp Med. Ctr. v. De La Garza*, 238 S.W.3d 767, 769 (Tex. 2007) (per curiam) (op. on reh'g) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001); *Nagle v. Nagle*, 633 S.W.2d 796, 801 (Tex. 1982)). Therefore, "the Statute of Frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds." *Haase*, 62 S.W.3d at 799; *see also Knapp Med. Ctr.*, 238 S.W.3d at 769. Although L&S and Seideman do not seek to recover damages, they are seeking the benefit of the bargain of an alleged oral contract that modified the Bank's rights under the Note and the guaranties. Accordingly, absent an exception, the statute of frauds bars L&S's and Seideman's reliance on the alleged oral agreement to be relieved of their contractual obligations. *See Bagwell v. BBVA Compass*, No. 05-14-01579-CV, 2016 WL 3660403, at *5 (Tex. App.—Dallas July 7, 2016, no pet.) (mem. op.).

–27–

L&S contends its affirmative defenses are not barred by the statute of frauds because, due to its reliance on Holmes's misrepresentations, the Bank is estopped from seeking a deficiency against L&S. The supreme court has recognized that "promissory estoppel [is] an exception to the statute of frauds." *Trammel Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 636 (Tex. 1997) (citing *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937–38 (Tex. 1972)). The elements of promissory estoppel are: (1) a promise; (2) foreseeability of reliance on the promise by the promisor; and (3) substantial detrimental reliance by the promisee. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *Bagwell*, 2016 WL 3660403, *3. When promissory estoppel is raised as a defense to the statute of frauds, the promisee must establish (1) there is an oral agreement that is barred by the statute, (2) an additional promise to sign an existing writing containing the terms of the oral agreement, and (3) that writing would satisfy the statute of frauds. *Bagwell*, 2016 WL 3660403, at *3 (citing *"Moore" Burger, Inc.*, 492 S.W.2d at 937; *Nagle*, 633 S.W.2d at 800); *see also Bank of Tex. N.A. v. Gaubert*, 286 S.W.3d 546, 553 (Tex. App.—Dallas 2009, pet. dism'd w.o.j.).

The record contains no written agreement for modification of the Note or the guaranties or that the Bank would not seek to recover a deficiency from L&S or the guarantors. Nor is there evidence that Holmes or any other representative of the Bank promised to sign a written agreement modifying the Note or the guaranties to reflect the Bank would not seek to recover a deficiency if L&S and its tenants vacated the Property. Accordingly, promissory estoppel is not a defense to the Bank's claims the statute of frauds precludes the pleaded affirmative defenses. *See Gaubert*, 286 S.W.3d at 555 (concluding promissory estoppel exception did not apply because there was no evidence of promise to sign existing writing satisfying statute of frauds); *Deubler v. Bank of N.Y. Mellon*, No. 07-13-00221-CV, 2015 WL 3750312, at *7 (Tex. App.—Amarillo June 15, 2015, pet. denied) (mem. op.) (concluding statute of frauds barred claim based on promises to modify loan

agreement); *Ellen v. F.H. Partners, LLC*, No. 03-09-00310-CV, 2010 WL 4909973, at *5–6 (Tex. App.—Austin Dec. 1, 2010, no pet.) (mem. op.) (concluding alleged promise by bank representative to delay foreclosure was barred by statute of frauds).

Seideman argues the statute of frauds does not bar the affirmative defenses of fraud, waiver, and estoppel due to the partial performance exception. *See Stovall & Assocs., P.C. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 800 (Tex. App.—Dallas 2013, no pet.) ("Partial performance has been recognized as an equity-based exception to the statute of frauds."). "[C]ontracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud." *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied); *Tatum v. Wells Fargo Home Mortg., Inc.*, No. 01-13-00855-CV, 2014 WL 7474074, at *6 (Tex. App.—Houston [1st Dist.] Dec. 30, 2014, no pet.) (mem. op.). "The fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit." *Breezevale Ltd.*, 82 S.W.3d at 439. The partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Id.* (quoting *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App.—Texarkana 1989, no writ)); *see also Healey v. Romero*, No. 05-16-00598-CV, 2018 WL 2126903, at *2 (Tex. App.—Dallas May 7, 2018, no pet. h.) (mem. op.). For the exception to apply, there must be "more than just one party's performance of some obligation under the alleged oral contract." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 n.2 (Tex. 2015) (per curiam). Rather,

> [T]he purpose of the alleged acts of performance must be to fulfill a specific agreement. If the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable.

*Id.* at 426–27; *see also Breezevale Ltd.*, 82 S.W.3d at 439–40 ("The acts of performance relied upon to take a parol contract out of the statute of frauds must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced.").

Seideman and the Lemelins testified they would not have vacated the Property when they did and L&S would not have made an insurance claim to repair the vandalism to the Property except for Holmes's representations the Bank would not seek to recover a deficiency from them. However, Brian indicated in a March 2014 email to Holmes that regulatory changes had greatly impacted Lexxiom's business; many of Lexxiom's clients, who were attorneys, were no longer accepting new clients; L&S and the Lemelins owed a significant sum of money to BOA; and L&S vacated the Property in order to "manage their expenses." Seideman was one of Lexxiom's clients and closed his law office in California by December 1, 2013. Accordingly, L&S and its tenants' decision to vacate the Property could have been due to regulatory changes that impacted Lexxiom's and Seideman's businesses in California, and L&S's need to sell the Property to manage its expenses in the new business environment. Therefore, L&S's decision to have its tenants vacate the Property was not "unequivocally referable" to the alleged oral agreement, and the partial performance exception is not applicable in this case.

We conclude the statute of frauds bars L&S's affirmative defenses of fraud and estoppel and Seideman's affirmative defenses of fraud, waiver and estoppel. Accordingly, the trial court erred to the extent it granted judgment in favor of L&S or Seideman based on these affirmative defenses. Further, because Seideman's affirmative defenses of fraud, waiver, and estoppel are precluded by the statute of frauds, the same affirmative defenses pleaded by the Lemelins based on the same facts are also precluded by the statute of frauds. We resolve the Bank's third issue and the Lemelins' second issue in favor of the Bank.

*Failure to Give Notice*

In its first issue, the Bank asserts the trial court erred by concluding the Bank's claims against Seideman were barred by lack of notice of the foreclosure sale, fraud, waiver, or estoppel because Seideman contractually waived all defenses other than payment. We have already concluded Seideman's affirmative defenses of fraud, waiver, and estoppel are barred by the statute of frauds. We, therefore, consider only whether Seideman contractually waived any right to assert lack of notice of the foreclosure sale as an affirmative defense.

Relying on section 14 of the DOT, Seideman asserts he had a contractual right to notice of the foreclosure sale. Seideman specifically argues the DOT stated it was intended to secure all indebtedness, including any indebtedness evidenced by his guaranty, (2) the DOT "must be interpreted to require [the Bank] to provide notice of the foreclosure sale to the guarantors, including Seideman, because the guarantors are debtors under the [DOT]," and (3) because the DOT, the Note, and the guaranty anticipated there would be instances where the Bank was required to provide notice, "any defense based on failure to provide contractual notice was not waived."

The DOT, however, states it was intended to secure and enforce payment of the Note and any other indebtedness of L&S to the Bank. Although Seideman agreed to pay L&S's indebtedness if L&S defaulted, his guaranty was additional collateral for L&S's indebtedness, not additional indebtedness under the Note. We need not determine, however, whether Seideman had a contractual right to notice of the foreclosure sale because he clearly waived any right to assert lack of notice as a defense to a claim for payment under the guaranty.

Waiver is an "intentional relinquishment or abandonment of a known right or privilege," or the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 6 (Tex. 2014) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Sun Exploration & Prod. Co. v. Benton*,

–31–

728 S.W.2d 35, 37 (Tex. 1987)).  Waiver is largely a matter of intent.  *Crosstex Energy Servs.,*

*L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 393 (Tex. 2014).  "To be effective, the waiver must be

clear and specific."  *Moayedi*, 438 S.W.3d at 6.  Whether there has been a waiver depends on the

circumstances of the case, but "[t]here can be no waiver unless so intended by one party and so

understood by the other."  *Id.* at 6–7 (quoting *Lesikar v. Rappeport*, 33 S.W.3d 282, 300 (Tex.

App.—Texarkana 2000, pet. denied)).  Although waiver generally presents a question of fact,

when, as in this case, the "facts and circumstances are admitted or clearly established, the question

becomes one of law."  *Crosstex Energy Servs., L.P.*, 430 S.W.3d at 394 (quoting *Motor Vehicle*

*Bd. of the Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111

(Tex. 1999) (per curiam)).

The Bank argues Seideman waived any right to assert lack of notice of the foreclosure sale

as a defense, while Seideman contends all the documents relating to the transaction must be read

together, he had a right to notice of the foreclosure sale pursuant to the DOT, and any conclusion

that he waived the right to notice "would render the notice requirements contained in [the DOT]

meaningless."  We agree with Seideman that we must examine and consider the entire contract to

determine the parties' intentions as expressed in the instrument.  *Moayedi*, 438 S.W.3d at 7.

However, even if Seideman had a right under the DOT to notice of the foreclosure, he could waive

the right to assert any lack of notice as a defense to a claim based on the guaranty.  *See Motor*

*Vehicle Bd. of the Tex. Dep't of Transp.*, 1 S.W.3d at 111 ("A party's express renunciation of a

known right can establish waiver.").

In the guaranty, Seideman agreed (1) his guaranty would not be "discharged, impaired or

affected" by "any defense (other than the full payment of the indebtedness hereby guaranteed in

accordance with the terms hereof)" that he might have and (2) "each and every defense" was

waived.  We conclude Seideman clearly and specifically waived all defenses other than payment,

including any defense based on the Bank's failure to provide him notice of the foreclosure sale. Accordingly, we resolve the Bank's first issue as it relates to Seideman's defense of lack of notice in its favor.[12]

## Conclusion

We conclude (1) the California anti-deficiency statute does not bar the Bank's claims against L&S or the guarantors, (2) L&S's affirmative defenses of fraud and estoppel and the guarantors' affirmative defenses of fraud, waiver, and estoppel are barred by the statute of frauds, and (3) Seideman contractually waived any defense based on lack of notice of the foreclosure sale. Accordingly, we affirm the trial court's judgment against the Lemelins, but reverse the trial court's judgment in favor of L&S and Seidman. We render judgment that the Bank recover its actual damages of $5,070.172.22 from the Lemelins, L&S, and Seidman, jointly and severally. Because we have significantly changed the trial court's judgment, we reverse the trial court's judgment as to the assessment of attorneys' fees, expenses, and court costs and remand this case to the trial court for reassessment of the parties' liability for those fees and expenses.

/Robert M. Fillmore/
_____
ROBERT M. FILLMORE
JUSTICE

170381F.P05

---

[12] Based on our resolution of the Bank's first and third issues, we need not address the Bank's or the Lemelins' arguments about the legal and factual sufficiency of the evidence or the Bank's second issue regarding whether Seideman received proper notice of the foreclosure sale. *See* TEX. R. APP. P. 47.1.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BRANCH BANKING & TRUST
COMPANY, Appellant & Cross-Appellee

No. 05-17-00381-CV        V.

SCOTT SEIDEMAN, Appellee & Cross-
Appellant, AND L&S INVESTMENT
PARTNERS, LLC, Appellee

ROBERT LEMELIN, LEO LEMELIN,
BRIAN LEMELIN AND SCOTT
SEIDEMAN, Appellants

V.

BRANCH BANKING & TRUST
COMPANY, Appellee

On Appeal from the 95th Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-14-12543.
Opinion delivered by Justice Fillmore,
Justices Lang and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED** in part and **REVERSED** in part.

We **AFFIRM** that portion of the trial court's judgment ordering that Branch Banking &
Trust Company recover its actual damages from Robert Lemelin, Leo Lemelin, and Brian
Lemelin.

We **REVERSE** that portion of the trial court's judgment ordering that Branch Banking &
Trust Company take nothing from Scott Seideman and L&S Investment Partners, LLC.

We **RENDER** judgment that Branch Banking & Trust Company recover from Robert
Lemelin, Leo Lemelin,, Brian Lemelin, Scott Seideman and L&S Investment Partners, LLC,
jointly and severally, actual damages of $5,070,172.22.

We **REVERSE** the trial court's award of attorneys' fees, expenses, and court costs, and **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that Branch Banking & Trust Company recover its costs of this appeal from L&S Investment Partners, LLC, Robert Lemelin, Leo Lemelin, Brian Lemelin, and Scott Seideman.

Judgment entered this 21st day of June, 2018.